IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA

CHARLESTON DIVISION

CHARLES W. HOFFMAN and
TERRY SUSAN HOFFMAN, his wife,

          Plaintiffs,

v.                                        CIVIL ACTION NO.  2:05-cv-00418

MONSANTO COMPANY, et al.,

          Defendants.

**MEMORANDUM OPINION AND ORDER**

Pending before the court are the defendants' Motion for Summary Judgment [Docket 133], and Motion to Exclude Plaintiffs' Expert, Terrence Stobbe [Docket 190]. The defendants argue that the plaintiffs have failed to point to evidence in the record that would support each factual element of a deliberate intent cause of action. For the following reasons, the court **GRANTS** defendants' motions.

**I.     Background**

Monsanto employed Charles Hoffman as an operator or head operator in Building 91 at its Nitro, West Virginia, plant from 1972 until the plant was sold in 1996. (Pl. Mem. Opp. 5.) Mr. Hoffman continued to work at that facility as an employee of subsequent owners until 2003. The defendants used various chemicals in the manufacturing processes in Building 91, including trichloroethylene ("TCE"), xylene, clenzolene, morpholine, and butyraldehyde.  The plaintiffs

1

allege that during the course of his employment, he was exposed to breathable fumes from aromatic hydrocarbon products, including but not limited to TCE, which were used in the production of chemical products in the unit. (Compl. Para. 6-9.) The defendants concede that the alleged aromatic hydrocarbons were present in Building 91 during the plaintiff's employment. (Def. Mem. Supp. 2.)

Mr. Hoffman contends that he was exposed to impermissibly high levels of TCE and other chemicals in at least three settings. First, he asserts that he inhaled fumes highly saturated with TCE while cleaning the brick floors of Building 91 with five–gallon buckets of undiluted TCE. (Depo. of Charles W. Hoffman, p. 81.) Second, Mr. Hoffman now maintains that he was exposed to xylene while cleaning trench sewers. (Pl. Amend. Mem. Opp. 3.) Finally, Mr. Hoffman claims that the defendants did not "provid[e] proper respiratory protection." (Pl. Amend. Mem. Opp. 3.) Mr. Hoffman alleges that he has developed non–Hodgkin's lymphoma and cardiac failure as a result of exposure to TCE and other chemicals during the earlier years of his employment, from approximately 1972 until 1989.

The plaintiffs filed this action in the Circuit Court of Kanawha County, West Virginia, on March 30, 2005, against Monsanto Company ("Monsanto"), Pharmacia Corporation ("Pharmacia") and others. The defendants timely removed the case to this court on May 19, 2005. Following removal, the court dismissed all defendants except Monsanto and Pharmacia. Mr. Hoffman seeks to recover against the defendants pursuant to the deliberate intent exception to workers' compensation immunity. *See* W. VA. CODE 23-4-2(d).

The Hoffmans' complaint contains three counts relevant to the remaining defendants. In Count I of the complaint, the plaintiffs allege that Monsanto acted with deliberate intention to cause Mr. Hoffman's injuries because Monsanto was aware that employees who were exposed to liquid

2

aromatic hydrocarbons were at a high risk of suffering serious injury or death. The plaintiffs claim that Monsanto knew that such unsafe working conditions violated federal safety statutes, rules, regulations or commonly accepted industry safety standards. Specifically, the Hoffmans assert that the violations include failure to conduct adequate hazard assessments, failure to provide personal protective equipment fitting, failure to provide appropriate air and biological monitoring, and failure to conduct adequate hazardous material training. The plaintiffs contend that, as a result of being exposed to these unsafe working conditions, Mr. Hoffman has suffered from non–Hodgkin's lymphoma and congestive heart failure. In Count II of the complaint, the plaintiffs asserts that Monsanto acted with a consciously, subjectively, and deliberately formed intention to produce the specific result of injury to Mr. Hoffman. The plaintiffs assert that this conduct warrants punitive damages, in conjunction with Count VII.[1] In the remaining counts of the complaint, plaintiff brings claims against unspecified defendants for negligence, breach of warranty, and strict liability. Count XII of the complaint states Ms. Hoffman's claim for loss of consortium.

Monsanto asserts that it is entitled to immunity from civil liability as Mr. Hoffman's employer because the West Virginia workers' compensation system provides Mr. Hoffman with his exclusive remedy for any work related injury or disease unless he can prove a deliberate intent cause of action. W. VA. CODE 23–4–2. The deliberate intent statute can be satisfied in one of two ways: (1) a so-called "consciously formed" deliberate intent; or (2) through proof of five elements which establish a prima facie case of deliberate intent. W. VA. CODE 23–4–2(d) (2003).[2]

---

[1] The plaintiffs' complaint contains two Counts labeled "VII," the second of which is titled as "Punitive Damages" and which is applicable here.

[2] The West Virginia Legislature amended Section 23–4–2 with an effective date of July 1, 2005. Plaintiff filed this action on March 30, 2005. The provisions of the Code

**II.     Standard of Review**

To obtain summary judgment, the moving party must show that no genuine issue as to any material fact exists and that the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). In considering a motion for summary judgment, the court will not "weigh the evidence and determine the truth of the matter." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986). Instead, the court will draw any permissible inference from the underlying facts in the light most favorable to the nonmoving party. *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587-88 (1986). Although the court will view all underlying facts and inferences in the light most favorable to the nonmoving party, the nonmoving party nonetheless must offer some "concrete evidence from which a reasonable juror could return a verdict in his [or her] favor." *Anderson*, 477 U.S. at 256. Summary judgment is appropriate when the nonmoving party has the burden of proof on an essential element of his or her case and does not make, after adequate time for discovery, a showing sufficient to establish that element. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986). The nonmoving party must satisfy this burden of proof by offering more than a mere "scintilla of evidence" in support of his or her position. *Anderson*, 477 U.S. at 252.

**III.    Dr. Stobbe's Testimony**

The Federal Rules of Evidence allow expert witnesses to provide an opinion if "(1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case." Fed. R. Evid. 702. In addition, the trial court must serve as a gatekeeper to "ensure that any and all scientific testimony . . . is not only relevant, but reliable." *Kumho Tire Co., Ltd. v.*

---

applicable in this case, therefore, are those in effect prior to the 2005 amendments.

*Carmichael*, 526 U.S. 137, 147 (1999) (citing *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 589 (1993)).

In performing this function, a trial court may look to several factors to assess the reliability of a proffered expert, including:

> (1) whether the expert's technique or theory can be or has been tested — that is, whether the expert's theory can be challenged in some objective sense, or whether it is instead simply a subjective, conclusory approach that cannot reasonably be assessed for reliability; (2) whether the technique or theory has been subject to peer review and publication; (3) the known or potential rate of error of the technique or theory when applied; (4) the existence and maintenance of standards and controls; and (5) whether the technique or theory has been generally accepted in the scientific community.

Fed. R. Evid. 702, advisory committee's note (2000) (citing *Daubert*, 509 U.S. at 592-94). In addition to the factors provided by *Daubert*, a court may assess

> (1) Whether experts are proposing to testify about matters growing naturally and directly out of research they have conducted independent of the litigation, or whether they have developed their opinions expressly for purposes of testifying.
> (2) Whether the expert has unjustifiably extrapolated from an accepted premise to an unfounded conclusion.
> (3) Whether the expert has adequately accounted for obvious alternative explanations.
> (4) Whether the expert is being as careful as he would be in his regular professional work outside his paid litigation consulting.
> (5) Whether the field of expertise claimed by the expert is known to reach reliable results for the type of opinion the expert would give.

Fed. R. Evid. 702, advisory committee's note (2000) (citations and quotations omitted). No individual factor is dispositive, and the court may use these non-exclusive factors — in addition to others – in determining whether to exclude an expert's testimony. *See Kumho*, 526 U.S. at 152 ("[W]e conclude that the trial judge must have considerable leeway in deciding in a particular case how to go about determining whether particular expert testimony is reliable.").

    A.    <u>Relevance of Testimony</u>

Dr. Stobbe is, by all accounts, a very qualified individual. According to the plaintiffs, "Dr. Stobbe has a PhD in his field, is certified by a national certifying organization in Industrial Hygiene, [and has] taught Industrial Hygiene for many years at West Virginia University." (Pls.' Resp. to Mot. in Lim. [Docket 209], p 9.) The defendants acknowledge that Dr. Stobbe "has been educated in the field of industrial hygiene." (Defs.' Mem. Supp. [Docket 196] p 5.) In his exposure assessment, Dr. Stobbe offers opinions which would aid the jury in determining whether Mr. Hoffman was exposed to impermissibly high levels of aromatic hydrocarbons. To that extent, Dr. Stobbe's testimony is relevant and would bear on the probative nature of several facts necessary to a jury in assessing the plaintiffs' deliberate intent case. The defendants main objection, however, relates to the reliability of Dr. Stobbe's testimony.

B.  Reliability of Dr. Stobbe's Testimony

In his "Supplemental Exposure Estimate and Workplace Analysis," Dr. Stobbe opines that the three alleged exposures resulted in Mr. Hoffman inhaling air containing TCE in levels exceeding 1000 parts per million. Dr. Stobbe relies on various factors in reaching this conclusion. He reviews the method of cleaning, the amount of TCE used, the nature of the task, and the symptoms the employees reported in their own depositions. He performs no experiments or demonstrations — rough or precise. In some scenarios, he uses the average daily exposure to calculate the percentage of exposure allowed under OSHA standards (*e.g.*, 5 ppm TCE exposure at 100 ppm OSHA daily average standard equals 5% of total OSHA exposure). Dr. Stobbe also cites air quality measurements conducted by the defendants that indicate that on at least one occasion TCE levels reached 556 parts per million, although the details surrounding the measurement are unclear. The

6

only other calculation provided by Dr. Stobbe is a handwritten formula used for calculating the exposure assessment for mixed solvents, although he never employs the formula in his report.

Elsewhere, Dr. Stobbe provides testimony that "it is clear that the OSHA/ACGIH standards for Xylene exposure were both exceeded on many occasions" in the building in which Mr. Hoffman worked. Dr. Stobbe bases his opinion on the self-reported statements of employees who describe "daily exposures, . . . extreme uncontrolled exposure each time specific activities such as heel digging, working around the dryer, working around the trench drains" or other activities. [Docket 190-3, p.7.] Once again, Dr. Stobbe converts the Xylene exposure average to a percentage of the daily exposure limit provided by OSHA.

Dr. Stobbe also provides opinions related to additional substances, such as Stoddard Solvent (Clenzolene, Kwik-Dri), Petroleum Naptha, and other mixtures. In reviewing these substances, he concludes that the exposures were generally within the accepted OSHA levels, but that the exposure levels "occasionally exceeded" OSHA standards. Yet again, Dr. Stobbe performs no real calculation, other than to determine the exposure average as a percentage of the daily exposure limit provided by OSHA.

As his Exposure Estimate details, the information on which he relies is incomplete and imprecise. He relies primarily on two things: 1) the testimony of employees, and 2) the documents provided through discovery, which include periodic air sampling performed by or for Monsanto from 1977 through 1992. Given the source of measurement for the solvents, "a precise exposure estimate cannot be done." (Dr. Stobbe's Rep. p 1.) Thus, what Dr. Stobbe provides is "an exposure range or profile." (Dr. Stobbe's Rep. p 1.) Assuming, for the present purposes, that Dr. Stobbe has

7

relied upon "sufficient facts or data," I must next assess whether Dr. Stobbe's testimony is the product of reliable principles and methods.

Dr. Stobbe reviewed exposure readings from air quality and samples and compared those to the OSHA exposure standard. This portion of his report is simple. The more troubling aspect, however, involves Dr. Stobbe's conclusion that TCE exposures exceeded 1000 ppm, and that "standards for TCE exposure were all exceeded on many occasions." (Dr. Stobbe's Rep. p 5-6.) In reaching this conclusion, he relies on "the rapidity with which the exposure's symptoms came on and the vapor volume of TCE created." (Dr. Stobbe's Rep. p 5-6.) The difficulty arises because Dr. Stobbe does not provide a benchmark for determining the rapidity of the onset of symptoms or a method for calculating the volume of TCE created. Dr. Stobbe therefore presents the same problem faced by teachers around the globe: he does not show his math.

> Q. You personally didn't do any math calculations to come up with this 1000 parts million, did you?
> A. Not to come up with the 1000, no.
> Q. Again, that's just an estimate based on the symptoms reported to you and what you just talked about here?
> A. Right.

(Stobbe Dep. 195-96)

Take, for example, his discussion of exposures to mixed solvents: "For the irregular exposures like heel digging that result in high uncontrolled exposures the mixture calculation adds up to about 1500% (15x's) the [average exposure over a nominal 8 hour workday]." (Dr. Stobbe's Rep. p 10.) One has no way of confirming or disputing this calculation without knowing how he reached this conclusion. Thus, the court cannot definitively conclude that this technique or theory can be or has been tested. *See Daubert*, 509 U.S. at 593. Likewise, this testimony does not appear to offer itself to formal challenge, but rather appears to be "simply a subjective, conclusory approach

that cannot reasonably be assessed for reliability." Fed. R. Evid. 702, advisory committee's note (2000) (citing *Daubert*, 509 U.S. at 592-94). Moreover, one may not calculate "the known or potential rate of error" of Dr. Stobbe's technique without knowing which technique he employed in reaching his conclusions. *Daubert*, 509 U.S. at 594.

In this case, Dr. Stobbe's testimony suffers from the defect that "there is simply too great an analytical gap between the data and the opinion proffered." *General Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997). Although he begins with hard data in the form of measurements conducted by the defendants, he ends with conclusions that are unjustifiably extrapolated from the premise with which he begins.

For those reasons, the court **FINDS** that Dr. Stobbe's testimony should be excluded, and the defendants' Motion to Exclude [Docket 190] is therefore **GRANTED**.

**IV.     Deliberate Intent**

A."Consciously Formed" Deliberate Intent

The defendants aver that the plaintiffs have failed to introduce any evidence that would support a "consciously formed" deliberate intent cause of action under § 29-4-2(d)(2)(i). In order to survive a motion for summary judgment, the plaintiffs must show facts that would prove that the defendants acted with a "consciously, subjectively and deliberately formed intention to produce the specific result of injury or death" to Mr. Hoffman. W. VA. CODE § 29-4-2(d)(2)(i). The plaintiff may prove this only by showing "an actual, specific intent." The statute specifically excludes "[c]onduct which produces a result that was not specifically intended; . . . conduct which constitutes negligence, no matter how gross or aggravated; or . . . willful, wanton or reckless misconduct." W. VA. CODE § 29-4-2(d)(2)(i)(A-C).

9

As I indicated at oral argument, and after reviewing the record provided by the parties, I have found no evidence that indicates that the defendants acted with "an actual, specific intent" to cause harm to the plaintiffs. I have also found nothing which constitutes "willful, wanton or reckless misconduct," let alone anything surpassing it which might trigger liability. For these reasons, I **FIND** that the plaintiffs have failed to present a material issue of fact on Count II of the Complaint.

B. Prima Facie Deliberate Intent

In order to prevail on his statutory deliberate intent claim, Mr. Hoffman must show: 1) that a "specific unsafe working condition existed in the workplace which presented a high degree of risk and a strong probability of serious injury or death;" 2) that the employer had "a subjective realization" of the alleged specific unsafe working condition; 3) the specific unsafe working condition was a "violation of a state or federal safety statute, rule or regulation, whether cited or not, or of a commonly accepted and well-known safety standard within the industry or business of the employer" which was not a general safety standard, but which applied specifically to the working condition involved; 4) "the employer nevertheless thereafter exposed an employee to the specific unsafe working condition intentionally;" and 5) that the plaintiff "suffered serious injury or death as a direct and proximate result of the specific unsafe working condition." W. VA. CODE § 29-4-2(d)(2)(ii)(A-E).

The defendants focus their argument on the plaintiffs' proof on the third and fifth elements of the deliberate intent statute. The plaintiffs, they argue, cannot point to a violation of a specific safety statute or regulation, and, even if they could, they have not offered proof that shows that such a violation proximately caused Mr. Hoffman's injuries.

10

### 1. Violation of Safety Standard

The plaintiffs contend that a 1976 OSHA violation related to the use of respirators constitutes a "violation of a state or federal safety statute, rule or regulation" which specifically applied to the working condition involved. In support of this, the plaintiffs point to the language of the citation which indicates that the defendants "did not establish and maintain a respiratory protection program" which included training, cleaning, inspection and usage under certain unlisted circumstances. (*See* Pl. Amend. Resp. Exh. 9, 4a-h.) The plaintiffs argue that this condition violated 29 CFR 1910.134 and American National Standard Institute ("ANSI") standard Z88.2-1969, both of which mandate the implementation of a respiratory program.[3] The plaintiffs claim that this failure to adopt and maintain a breathing apparatus program constitutes a violation of a safety regulation or standard for the purposes of satisfying the third element of the deliberate intent statute.

The defendants counter that the cited statutes are general safety statutes rather than specific safety statutes that apply directly to the particular working condition involved. In support of this, the defendants cite *Greene v. Carolina Freight Carriers*, 663 F. Supp. 112 (S.D. W. Va. 1987). In *Greene*, the plaintiff slipped on a broken step when he entered a truck and alleged that the failure to fix the step constituted a violation of a safety standard. The court reviewed a Department of Transportation regulation which required motor carriers to inspect and maintain all motor vehicles. That regulation provided:

> Parts and accessories shall be in safe and proper operation condition at all times. These include those specified in Part 393 of this subchapter and any additional parts and accessories which may affect safety of operation, including but not limited to, frame and frame assemblies, suspension systems, axles and attaching parts, wheels

---

[3] 29 CFR 1910.134 mirrors the language of ANSI Standard Z88.2-1969, which served as the basis for the OSHA regulation.

>and rims, and steering systems. 49 C.F.R. § 396.3(a)(1) (1985).

*Greene*, 663 F. Supp. at 114-15.

In this case, the plaintiffs highlight the language in 29 C.F.R. 134(a)(2) (emphasis added) which states:

>Respirators shall be provided by the employer *when such equipment is necessary to protect the health of the employee*. The employer shall provide the respirators *which are applicable and suitable for the purpose intended*. The employer shall be responsible for the establishment and maintenance of a respiratory protective program which shall include the requirements outlined in [other portions of the regulation].

The plaintiffs argue that this regulation constitutes a safety regulation which applied specifically to the working condition involved, relying on *Ryan v. Clonch Industries*. 639 S.E.2d 756 (W. Va. 2006). In *Ryan*, the plaintiff suffered an eye injury while cutting metal banding on lumber. The plaintiff alleged that his employer failed to conduct a hazard assessment pursuant to 29 CFR 1910.132(d). Section 1910.132(d) mandates that "[t]he employer shall assess the workplace to determine if hazards are present, or are likely to be present, which necessitate the use of personal protective equipment (PPE). If such hazards are present, or likely to be present, the employer shall . . . [s]elect, and have each affected employee use, the types of PPE that will protect the affected employee from the hazards identified in the hazard assessment." In *Ryan*, the West Virginia Supreme Court of Appeals found that the "hazard inspection" regulation satisfied the "specificity" portion of the deliberate intent statute. It further held that a safety regulation is "specifically applicable to the particular work and working condition involved" when the standard is "*capable of application* to the specific type of work at issue." *Ryan*, 639 S.E.2d at 763-64.

>Based upon the foregoing discussion, we now hold that the violation of a statute, rule, regulation or standard is a proper foundation for the element of deliberate intent found at W. Va. Code § 23-4-2([d])(2)(ii)(C), where such statute, rule, regulation or

> standard imposes a *specifically identifiable duty upon an employer*, as opposed to merely expressing a generalized goal, and where the statute, rule, regulation or standard asserted by the employee is *capable of application to the specific type of work at issue*.

*Ryan v. Clonch Indus.*, 639 S.E.2d at764 (emphasis added). Thus, rather than looking to whether a safety standard is "specifically applicable to the particular work and working condition involved," W.VA. CODE 23-4-2(d)(ii)(C), I must look at whether the standard "imposes a specifically identifiable duty" that is merely "capable of application to the specific type of work at issue." *Ryan*, 219 W. Va. at 764.

The respirator safety regulation imposes the "specifically identifiable duty" on the defendants to provide respirators "when such equipment is necessary to protect the health of the employee." Further, the employer must develop and establish a respiratory protective program, when needed. These statements, while broad and goal-oriented in nature, nevertheless "impose[] a specifically identifiable duty" on the defendants, much like the duty on the employer in *Ryan*. *See* 219 W. Va. at 764 (finding that duty to "assess the workplace to determine if hazards are present" constitutes a specifically identifiable duty). Likewise, the respiratory statute is drafted broadly, to apply "when such equipment is necessary to protect the health of the employee," 29 C.F.R. 134(a)(2), such that the regulation is "capable of application to" the Mr. Huffman's working conditions. When coupled with the allegation by Mr. Hoffman that the defendants did not develop a respiratory program until well after he began his employment, the plaintiffs have identified a specific safety standard that the defendants violated. Thus, as broad and as amorphous as the regulation may be, I am compelled to **FIND** that the plaintiffs have made a prima facie showing on the third prong of the deliberate intent cause of action.

The plaintiffs additional reliance on the maximum exposure levels established in 29 C.F.R. 1910.93 is misplaced. Although the plaintiffs originally relied on exposure readings from December 1991 that indicated that TCE levels reached 556 parts per million – 226 ppm over the maximum exposure ceiling of 300 ppm – the plaintiffs have since retreated from this argument because of the lack of proof that Mr. Hoffman was present during the reading. The plaintiffs have not provided any other evidence which indicates that Mr. Hoffman was exposed to aromatic hydrocarbons in excess of OSHA standards. The closest the plaintiffs come is the testimony of Dr. Clifford Weisel [Docket 203 Exh.5]. Not only is Dr. Weisel's testimony inconclusive as to whether Mr. Hoffman was exposed to chemicals in violation of a safety standard (p.77), the attached portion of his transcript does not even indicate which chemical or chemicals Dr. Weisel is discussing.

## 2. Proximate Cause

At argument, I asked the plaintiffs to identify a witness or witnesses that could testify that the plaintiffs injuries were proximately caused by the specific unsafe working condition that was a violation of a safety regulation. In response to that question, the plaintiff stated that Dr. Weisenburger and Dr. Guberman "both concluded to a reasonable degree of medical certainty that Mr. Hoffman's non-Hodgkin's Lymphoma and subsequent heart disease were caused by his exposure to TCE and [other solvents]." (Pl. Amend. Mem. 15.)

A review of the offered proof does not support the plaintiffs' statement. First, the plaintiffs have not provided the portion of Dr. Weisenburger's testimony that indicates that he renders his opinion as to the cause of Mr. Hoffman's non-Hodgkin's lymphoma to a reasonable degree of medical certainty or probability. My examination of the record provided has only uncovered the portion of Dr. Weisenburger's deposition where indicates that his opinion is "that the substantial and

mixed solvent exposure in this case was a substantial contributing factor to his developing [NHL]." (Weisenburger Dep. 88.) Elsewhere in his deposition, Dr. Weisenburger states that "each and every exposure *potentially played an important role* in the cause of his disease." (Weisenburger Dep. 53 (emphasis added).) Thus, at best, Dr. Weisenburger states that Mr. Hoffman's exposure to chemicals "substantially contributed" to or "potentially played" a role in the development of Mr. Hoffman's injuries. Dr. Weisenburger's testimony does not satisfy the proximate cause prong of the deliberate intent statute.

Moreover, Dr. Weisenburger's testimony is flawed for another fundamental reason: he relies on Dr. Stobbe's exposure analysis in rendering his opinion as to the origin of Mr. Hoffman's disease. (*See* Dr. Weisenburger Dep. [Docket 206, Exh. 21] p 27) ("I think a lot of that is documented in the report and in the deposition of Terry Stobbe . . . he goes into great detail into all of the chemicals and all of the exposures, estimates of exposures by inhalation, et cetera."). Dr. Weisenburger continued:

> Q: Other than those opinions that are summarized in the disclosure and which we've talked about and elaborated on today, do you anticipate offering any additional opinions at trial?
> A: No. I mean, *my opinion is that the substantial and mixed solvent exposure in this case was a substantial contributing factor* to his developing non-Hodgin's lyphoma.

(Dr. Weisenburger Dep. p 88.) Further, Dr. Weisenburger could not conclude that the plaintiff was exposed to chemical levels that exceeded OSHA standards which would constitute a "violation of a state or federal safety statute, rule or regulation." W. VA. CODE § 23-4-2(d)(2)(ii)(C). Because I have excluded Dr. Stobbe's testimony related to the levels of exposure which would constitute such an OSHA violation, Dr. Weisenburger's testimony therefore does not present an issue of material fact as to whether the plaintiffs' injury arose

15

"as a direct and proximate result of the *specific unsafe working condition*." W. VA. CODE § 23-4-2(d)(2)(ii)(E).

Dr. Guberman's testimony also fails to support the proximate cause showing that is required by the statute. When asked to state if he could determine whether Mr. Hoffman's injuries were caused by occupational or idiopathic forces, Dr. Guberman could not answer definitively:

> Q: Are there any specific characteristics of Mr. Hoffman's [NHL] that demonstrate to you that it is occupational as opposed to idiopathic?
> A: No.
> Q: Therefore, there's nothing about his [NHL] which would allow you to either confirm or deny with any certainty that it is due to exposure to TCE?
> A: *I don't think you can be certain*, but I think you can say more likely than not there was a causal relationship . . . .

(Dr. Guberman Dep. 38-39 (emphasis added).) The proffered testimony does not satisfy the requirement that the plaintiff show that he "suffered serious injury or death *as a direct and proximate result of the specific unsafe working condition*." W. VA. CODE § 29-4-2(d)(2)(ii)(E) (emphasis added). The testimony in this case closely resembles in *Yeater v. Allied Chemical Co.* 755 F. Supp. 1330, 1342 (N.D. W. Va. 1991). In *Yeater*, an employee's executor filed suit based on the deliberate intent statute, claiming that the employee died as a result of his exposure to benzene in the workplace. *Id*. at 1333. At the summary judgment phase, the plaintiff relied on the testimony of a treating physician who "stated that it was *more likely than not* that benzene exposure was the predominant cause of [the employee's] death." *Id.* at 1334 (emphasis added). After reviewing the testimony, the court stated that it was "not convinced that [the physician's] finding is sufficient to establish proximate cause under" the deliberate intent statute. *Id.* at 1342. Further, the physician "did

16

not connect [the employee's] death to any of the . . . particular unsafe working conditions in plaintiff's complaint." *Id.* at 1342.

Dr. Guberman's testimony employs the same standard of causation as the physician's testimony rejected by the *Yeater* court. *Compare Yeater*, 755 F.Supp. at 1334 ("it was *more likely than not* that benzene exposure was the predominant cause of [the employee's] death") *with* Guberman Dep. 38-39 ("I think you can say *more likely than not* there was a causal relationship"). Furthermore, ther is nothing in the record that connects the tepid causal relationship to a specific unsafe working condition as required by the statute.

The hole in their testimony is especially large when, as is the case here, one of the proffered "specific unsafe working conditions" is a violation of the requirement to develop and maintain a respiratory program. The causal relationship, if any, is thus far too attenuated to satisfy the requirement that plaintiffs show that their injuries are a "direct and proximate result of the specific unsafe working condition." I therefore **FIND** that the plaintiffs have failed to raise a material issue of fact that the plaintiffs' injuries were proximately caused by one of the specific unsafe working conditions that violated a safety standard.

## V. CONCLUSION

Because the plaintiffs have failed to satisfy the fifth element of the deliberate intent cause of action, Monsanto Company and Pharmacia Corporation's Motion for Summary Judgment [Docket 133] is **GRANTED**. The plaintiffs' Motion to Exceed Page Limit [Docket 175] in the response to the Motion is **GRANTED**. The plaintiffs' Motion for Hearing on the Amendment to Response to Summary Judgment [Docket 208] is **DENIED**, as the parties have sufficiently presented the issues through briefing and the previous

argument. The defendants' Motion to Exclude Dr. Stobbe [Docket 190] is **GRANTED**. The remaining Motions in Limine filed by the defendants [Docket 141, 143, 144, 145, 146, 192, and 200], and Motion to Bifurcate Damages [Docket 139] are **DENIED** as moot.

The court **DIRECTS** the Clerk to send a copy of this Order to counsel of record and any unrepresented party.

ENTER: October 11, 2007

Joseph R. Goodwin, Chief Judge